IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| DAVID GREEN, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:17-cv-01365-LMB-TCB |
| | ) | |
| JEFFERSON B. SESSIONS III, Attorney | ) | |
| General, U.S. Department of Justice, et al., | ) | |
| | ) | |
| Defendants. | | |

MEMORANDUM OPINION

Before the Court are the defendants' Motions to Dismiss for Lack of Jurisdiction and for

Failure to State a Claim [Dkt. Nos. 26 and 27] ("Defs. Mts. Dismiss"), to which plaintiff David

Green, Jr. ("plaintiff" or "Green"), who is pro se, has filed an opposition, [Dkt. No. 30] ("Pl.

Opp'n"). The defendants have filed a reply [Dkt. No. 31] ("Defs. Reply"), and the Court finds

that oral argument will not assist the decisional process. For the reasons that follow, the

defendants' motions will be granted, and this civil action will be dismissed with prejudice.[1]

## I. BACKGROUND

Green, a former employee of the United States Department of Justice Executive Office of

Immigration Review ("EOIR"), has filed a six count Complaint against Jefferson B. Sessions III,

Attorney General of the United States ("Sessions"); Katherine H. Reilly, Acting Deputy

---

[1] Normally, dismissal of a pro se litigant's complaint under Fed. R. Civ. P. 12(b)(6) would be without prejudice to allow the plaintiff to correct pleading deficiencies if he had more facts to allege. The dismissal here will be with prejudice because Green attached to his Complaint hundreds of pages of exhibits which include, but are not limited to, his various performance appraisals, external email correspondence, the initial and final Department of Justice Equal Employment Opportunity investigative reports and decisions, and much of the Merit Systems Protection Board record. See generally [Dkt. Nos. 1, 13, 14]. Those exhibits contain no additional facts which could remedy the Complaint's pleading deficiencies and, instead, strongly support the conclusion that Green does not have a meritorious claim of being the victim of discrimination or retaliation.

Director, EOIR ("Reilly"); Terryne Murphy, former Chief Information Officer, EOIR ("Murphy"); and Ana Kocur, former Deputy Director, EOIR ("Kocur") (collectively, the "defendants"), alleging in Count 1 race and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), Compl. [Dkt. No. 1] ¶¶ 1, 72-102; in Count 2 age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), id. ¶¶ 1, 103-04; in Count 3 retaliation for engaging in protected activity under Title VII and the ADEA, id. ¶¶ 1, 105-06; in Count 4 disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. (the "Rehabilitation Act"), id. ¶¶ 1, 107-15; in Count 5 hostile work environment under Title VII, the ADEA, and the Rehabilitation Act, id. ¶¶ 1, 116-17; and in Count 6 retaliation for engaging in whistleblower activity, id. ¶¶ 1, 118-25.

Green seeks $300,000 in compensatory damages for "the continuing physical and emotional pain, severe depression, continued impact to health [sic] disability, loss of health insurance, embarrassment, humiliation, mental anguish, inconvenience, career loss, continued loss of prospective employment opportunities due to negative performance record, and the resultant negative credit rating, loss of professional reputation, continued loss of personal assets (apartment, house, cars, TSP), federal taxes debt incurred due to abrupt change in income, severe damage to credit rating changing from excellent to poor, continued negative impact on family and friends, and the continued loss of enjoyment of life." Id. at 51. He also seeks front pay at the GS-15 pay level from the date he was terminated until he reaches the age of 65, and back pay commensurate with his higher rating, if his performance review is corrected, and for Absent Without Leave ("AWOL") time. Id. at 51-52. Green further seeks an order declaring that the defendants violated his rights under several federal anti-discrimination statutes; reinstatement to federal service with positive references; a requirement that any employment offers include

retroactive seniority; and a corrected prior performance review for 2014-2015, among other requested relief. Id.

## A. **Green's Employment History**

The following facts are uncontested as they are included either in Green's Complaint or in the numerous exhibits attached to his Complaint. When Green, who is an African American male, was terminated, he was 51-years old. He was hired by the EOIR on March 13, 2011 as the Chief of Operational Services, GS-14, in the Information Resource Management ("IRM") department. Compl. [Dkt. No. 1] ¶¶ 6, 10. On October 12, 2012, Green was promoted to Deputy Chief Information Officer, GS-15. Id. ¶ 14. He reported directly to Murphy once she became EOIR Chief Information Officer in May 2013, and she reported directly to Kocur, EOIR's then Deputy Director. Id. ¶¶ 13, 16. On July 31, 2014, as a result of Murphy reorganizing the IRM department, Green became the Director of Operations, with "primarily the same" duties and continued at the GS-15 level. Id. ¶ 20; Ex. C6 [Dkt. No. 1-32] ¶ 3.

Annual evaluations were reflected in Performance Work Plans ("PWP"). For Green's position, his PWP had six "critical" elements: (1) communication; (2) organization, planning and coordinating, (3) knowledge management; (4) customer support and professionalism; (5) leadership, integrity and management proficiency; and (6) accountability for organizational results. See, e.g., Ex. A3 [Dkt. No. 1-3] 2-14. Each critical element had a five-level scale ranging from "unacceptable," "minimally successful," "successful," "excellent," to "outstanding." Id. From 2011 until 2014, Green received overall "successful" to "outstanding" annual and semi-annual performance reviews, Compl. [Dkt. No. 1] ¶¶ 11, 15; however, during a mid-year review in November 2013, Murphy expressed concerns regarding Green's communication skills by commenting that his "inability or unwillingness to respond has resulted in particular findings for

3

the EOIR which will require deliberate and swift actions by [the agency]," Ex. A4 [Dkt. No. 1-4] 4. She also commented on his leadership skills by questioning his failure to verify information from a contractor providing IT services which resulted in a "significant outage [leaving the] EOIR without email for six business days," and wrote that similar issues "occurred at other times in the past several months." Id. In Green's April 2013 to March 2014 annual review, Murphy stated that he "performed at an overall successful level of performance," and had recently made "significant improvements in many areas of communication and management proficiency," id. at 5; however, he continued to have problems in those areas. For example, on September 12, 2014, Murphy sent Green an email advising that "[he] must learn to work with [his] colleagues. Negative attitudes and obstructionist behavior when [he] must coordinate and collaborate with [his] colleagues to get things done will no longer be tolerated…." Pl. Addt'l Exs. [Dkt. No. 14] 39. Murphy later sent more emails to Green again expressing frustration with his performance, and on November 6, 2014 she wrote "I am tiring of dealing with why you don't know what's going on in your area. Figure it out and fix your non-responsiveness and lack of awareness." Ex. J4 [Dkt. No. 1-58] 2.

On December 15, 2014, in a six-page letter, Murphy placed Green on a 90-day Performance Improvement Plan ("PIP"). Compl. [Dkt. No. 1] ¶ 29. In her letter, Murphy explained to Green that his performance for critical element one, communication, and critical element five, leadership-related skills, was at an "unacceptable level." Pl. Addt'l Exs. [Dkt. No. 13] 154-59. Regarding the communication element, Murphy's letter explained:

> Specifically, you are failing to communicate with your staff, your colleagues, and in some cases me, your supervisor. I have received numerous complaints about your lack of responsiveness to requests for information from your colleagues, your staff, and our customers. For example, your staff, one by one, has complained to me about your failure to provide information and more importantly, direction, on what to do about specific issues. Your colleagues have come to me to complain on

4

numerous occasions about how they receive no response or even acknowledgment from you regarding the questions they ask you regarding important matters that concern the budget request for your area as well as your lack of participation in projects. One specific example occurred during the budget planning cycle when your contractor required your guidance to establish what resources to plan for and submit to us for our overall budget request. Without any guidance from you, and after the deadline passed, your contractor came to your colleague and me to resolve the concerns so that the budget planning process could continue. Our component's ability to accurately reflect our needs in our budget requests is paramount to our overall success as an organization. Every senior member of this staff who holds the responsibility to communicate and collaborate within our leadership team knows this and readily owns this responsibility, except you.

Numerous other examples have been witnessed by all of the senior leadership within IRM, both government and contractor, during our most important bi-weekly collaboration meetings—The Technical exchange, the Change Management Board, and the Project Investment Review Committee. Repeatedly, you arrive more than ten minutes late to each meeting and say nothing during the meetings. If I do not directly ask you a question or direct you to take an action item, you add no value to the collaboration. You take no initiative, nor own any issue that is being discussed that involves your area—Operations—which nearly every issue we discuss concerns. Your team of contractors is routinely looking for guidance and direction from the government because you fail to provide any. When information, such as the status of an issue, is provided by your contractor staff, which you should communicate with your colleagues, you do not share it. It is not until we are in the meetings with your contractor staff present that your colleagues and I learn more information. Id. at 156.

For the leadership-related skills element, Murphy wrote:

As the Director of Operations it is your singular responsibility to provide consistent guidance and direction to your staff, government and contractor, on a myriad of issues and challenges that an IT operation and its projects typically entail.

A specific example is the Service Manager Project you are supposed to be leading as a Project Sponsor. On two occasions where I attended meetings in the last several weeks for this important effort to outfit your staff with a sufficient tool to provide service desk management for all incidents and requests, you said nothing for the entire duration of the meeting. Your lack of engagement and unwillingness to communicate and lead the effort leaves your team, government and contractor, without any leadership or direction and dooms them to failure unless your colleagues or I step in. It is simply inexcusable.

Another serious example of your failure to successfully perform in this critical element concerns how you ensure that your team's responsibilities are being met in your absence. On two separate occasions when you were going to be out of the

office for training at the end of October 2014 and while you were on leave in early November 2014, you failed to properly inform your team of open issues thereby leaving them unprepared to follow-through. Your government staff reported they had no idea they had been left in charge and that they knew nothing of the open issues. Your contractor staff had questions for me that should have been addressed by you prior to your departure. What is disheartening about this is that you do not have to be absent for your team to have these issues. They do not follow you because you are unwilling to lead them. Id. at 156-57.

The PIP listed a series of twelve steps Green was required to complete to bring his performance up to an "acceptable" level within 90 days and warned that if his performance did not meet the requisite threshold, he could be subject to "reassignment, demotion, or removal from the [EOIR]." Id. at 157-59. Although Murphy extended that 90-day deadline by three weeks, Green failed to meet the requirements. Pl. Addt'l Exs. [Dkt. No. 14-1] 9-14.

On May 13, 2015, Murphy served Green a notice of proposed removal based on her finding that Green failed to improve his performance to an "acceptable" level in the areas identified in the PIP. Compl. [Dkt. No. 1] ¶ 52. The notice cited seven specific examples of Green's unacceptable performance in the first critical element category, communication. These examples included the following:

> (1) Mike Barylski, Director for Program Support, requested information from you regarding desktop installation costs beginning on January 12, 2015. After several e-mail requests, you still had not responded to this request as of February 20, 2015.
>
> . . .
>
> (2) On December 29, 2014, Mr. Barylski requested estimated costs from you to fund the contracting company for the rest of the year as the current funding was ending on February 10, 2015. You did not respond and the request was repeated on January 8, 2015. You again did not respond and, on January 15, 2015, based on information obtained from one of the contracting employees who reports to you, Mr. Barylski made the funding decision.
>
> . . .
>
> (3) On January 14, 2015, you were asked to attend Microsoft status meetings involving discussions relevant to your department. You were asked for a response that week regarding whether the time was convenient. You did not respond and on January 26, 2014, after you did not attend the meeting, you were again asked whether a different time would be preferable so that you could attend the meetings. You did not respond.

. . .

(4) On January 27, 2015, Mr. Barylski contacted you regarding whether you needed additional hours added for one of the contract employees. You did not respond to this communication.

. . .

(5) On January 29, 2015 you were initially contacted regarding information needed for a data call due February 13, 2015. On February 5, 2015, you were asked about your progress and you did not respond. You were asked again on February 6, 9, and 10. You again failed to respond. On February 12, 2015, I learned that you waited until that day to gather the requested information. You were unable to meet the deadline set for the submission of the information.

. . .

(6) On February 19, 2015 it came to my attention that you had failed to respond to any communications from Iron Mountain, the company the Agency is working with on a data restoration project. Iron Mountain had begun attempting to contact you in November 2014 and made a few attempts to communicate with you. When I first learned of this nearly four months after their initial communication, you had not responded to them at all.

. . .

(7) On March 18, 2015, one of your peers, Larry Dixon, had to work from home to complete portions of the Systems Security Plan because you were unable to complete this assignment. I had told you several weeks prior which sections of the plan needed to be updated. When I reviewed the plan, the sections you were tasked with updating had not been updated. Pl. Addt'l Exs. [Dkt. No. 14-1] 9-11.

. . .

Murphy also cited five specific examples of Green's failures to satisfy element five,

leadership-related skills:

(1) On January 6, 2015, I requested that you review and update some information requested by the Justice Management Division (JMD) and asked that you include certain edits I had identified. You failed to accurately update the information and also limited the response to the changes I had identified…You put the most minimal effort into this assignment and demonstrated no initiative to ensure that it was done correctly.

. . .

(2) In December 2014, the East Mesa Immigration Court was experiencing problems with file/printer server. On January 9, 2015, one of your subordinates contacted you to request approval to replace the server. When you did not respond, your subordinate repeated the request on January 12, 2015. On January 13, you responded to your subordinate in a terse manner and instructed that the server be replaced immediately…Your response was unprofessional and should have been provided much more promptly. Your subordinates required your guidance and approval that you were not providing before taking action.

. . .

(3) On February 5, 2015, I reassigned the Mandatory PIV Card use project to another employee because you failed to acceptably handle the project. On January 22, 2015, you had contacted the Executive Officer in the Office of the Chief Immigration Judge to obtain information relevant to this project that I had instructed you to obtain. The project also required all of the domain controllers to be upgraded. As of February 5, four of eleven controllers had been upgraded and careless errors had been made each time. You had no plan for how to address the errors with your subordinates going forward and were unaware of the status of the project. Because we need to meet a deadline set by the Department for implementation of this project, and you had taken no ownership of it, I reassigned it to another employee.

. . .

(4) On February 5, 2015, I reassigned the enterprise backup system project to another employee because you failed to acceptably handle the project. Last year, the Agency suffered a major system outage. To ensure that such an outage does not happen again, you were tasked with overseeing the successful implementation of a backup system. The Director of Engineering and the Chief Architect had some concerns with the design of the system. I asked you to address these concerns. On February 2, 2015 I learned that you did not address these concerns and that you were not providing guidance or direction to the team working on this mission critical system.

. . .

(5) On March 18, 2015, you attended three meetings during which the update of the core switch configuration that had taken place over the prior maintenance weekend was discussed. When I had previously asked for a status on this from your contractor team, I discovered they did not have a status, none of the system checks had been done, and the government staff also did not know the system checks had not been done. During the three meetings on March 18, you did not at any time acknowledge that you and your team failed to perform routine testing…. Id. at 11-13.

. . .

Based on Green's failure to adhere to the series of steps delineated in the PIP and to improve his performance to an "acceptable" level, Murphy proposed his removal from the EOIR. Id. at 13. The EOIR gave Green an extension of time to respond to the notice of proposed removal. Green, through his attorney,[2] responded to the notice on June 8, 2015 primarily stating that Murphy's characterization of his performance was not "credible" and that he met the requisite threshold to satisfy the PIP. Compl. [Dkt. No. 1] ¶¶ 54, 56; Ex. P [Dkt. No. 1-95] 7. On

---

[2] Based on the Complaint and attached exhibits, it appears that Green only retained counsel in drafting a response to the notice of proposed removal. See, e.g., Compl. [Dkt. No. 1] ¶ 54; Ex. M [Dkt. No. 1-92] 29.

July 10, 2015, Kocur affirmed Murphy's recommendation that Green be removed and issued a removal decision. Compl. [Dkt. No. 1] ¶ 66; Pl. Addt'l Exs. [Dkt. No. 14-1] 277-83.

### B. Administrative Proceedings

Starting in October 2014, Green began anonymous discussions with the EOIR's Equal Employment Opportunity ("EEO") office about asserting allegations of discrimination and hostile work environment. Compl. [Dkt. No. 1] ¶ 126. After being placed on the PIP, Green met with the EOIR's EEO Director, Andrew Press ("Press"), to discuss filing an informal complaint; however, he did not file a complaint until January 15, 2015. Id. ¶¶ 82, 127; Ex. P [Dkt. No. 1-92] 6. On January 21, 2015, Press informed Kocur that Green filed an informal EEO complaint, and Murphy learned about the complaint later that same month. Compl. [Dkt. No. 1] ¶¶ 129-30.

On March 12, 2015, Green and Murphy participated in an unsuccessful mediation. Id. ¶¶ 44, 132. After the mediation failed, Green filed a formal EEO complaint on March 31, 2015. Id. ¶ 133. In that complaint, he alleged discrimination and hostile work environment based on race, gender, age, disability and for reprisal. Ex. P [Dkt. No. 1-95] 8. On May 14, 2015, Green amended his complaint to include a retaliation claim for engaging in prior EEO activity and amended it a second time on July 10, 2015 to include a wrongful termination claim after Kocur issued the removal decision. Compl. [Dkt. No. 1] ¶¶ 135-36; Ex. M [Dkt. No. 1-92] 47.[3] After a full EEO investigation, the Department of Justice ("DOJ") issued a Final Agency Decision on June 27, 2016 finding, that the record did not support Green's claims of discrimination or hostile work environment based on race, gender, age, or disability nor was there support for his retaliation claim. Compl. [Dkt. No. 1] ¶ 142; Ex. N [Dkt. No. 1-93] 2-27. Green timely appealed

---

[3] For consistency and clarity, Green's amended EEO complaint will be referred to as the "EEO complaint."

the DOJ's decision to the Merit Systems Protection Board ("MSPB") on July 11, 2016. Compl. [Dkt. No. 1] ¶ 143.

While Green's EEO proceeding was pending, he filed a whistleblower complaint with the Office of Special Counsel ("OSC") on September 8, 2015. Id. ¶ 138. On August 4, 2016, Green requested that the OSC close his complaint, and he amended his MSPB appeal to include the whistleblower claim, id. ¶¶ 146, 149; however on December 12, 2016, at a prehearing conference, Green withdrew the whistleblower claim from the MSPB appeal. Id. ¶ 155; Ex. P [Dkt. No. 1-95] 27 n. 5 ("[A]t the prehearing conference [Green] withdrew his allegation that the agency's actions in placing him on a PIP and removing him were reprisal for protected whistleblower activity.").

On September 29, 2017, an MSPB Administrative Judge ("AJ") affirmed the DOJ's findings that Green did not suffer unlawful discrimination or retaliation, Compl. [Dkt. No.1] ¶ 161; Ex. P [Dkt. No. 1-95] 2, by concluding that:

> [Green] has not satisfied his burden of proving by preponderant evidence that his race, gender, or age motivated Ms. Murphy to either place him on a PIP or propose his removal at its conclusion…[and] [t]he scant evidence [Green] proffered in support of his claim is insufficient to demonstrate by a preponderance that Ms. Murphy's actions were motivated by his disability…[and] [c]onsidering all the evidence in the record, I do not find that [Green] established by a preponderance of the evidence that his placement on a PIP and subsequent removal were motivated, even in part, by protected activities. Ex. P [Dkt. No. 1-95] 30, 32, 34.

The AJ's decision became final on November 3, 2017. Compl. [Dkt. No. 1] ¶ 162. Green timely filed his Complaint in this court on November 30, 2017.

## II. DISCUSSION

The defendants move to dismiss Green's Complaint on multiple grounds. Defs. Mts. Dismiss [Dkt. Nos. 26 and 27]. First, they argue that under Fed. R. Civ. P. 12(b)(1) the Court does not have subject matter jurisdiction to consider Green's claims of constructive discharge,

delayed separation, failure to provide a reasonable accommodation, and whistleblower retaliation because he failed to exhaust these claims during the administrative proceedings. Defs. Br. [Dkt. No. 28] 2. Second, the defendants argue that under Fed. R. Civ. P. 12(b)(6) Green has not pleaded sufficient facts to support the remainder of his claims of discrimination and hostile work environment because he only alleges generalized workplace grievances unrelated to his race, gender, age or alleged disability and that such claims are not actionable under federal anti-discrimination statutes. Id. at 2-3. They also argue that the Complaint fails to allege sufficient facts to sustain a retaliation claim and that the individual defendants must be dismissed because they are not subject to suit under the statutes that Green invokes. Id.

### A. Individual Liability

At the outset, the defendants correctly argue that they are not individually liable because Title VII, the ADEA, and the Rehabilitation Act apply only to employers, and not to individual employees. See, e.g., Scott v. Md. State Dep't of Labor, 673 F. App'x 299, 307-08 (4th Cir. 2016) ("[I]ndividual defendants are not appropriate parties to [an ADEA] lawsuit."); Salagh v. Va. Int'l Univ., 2017 U.S. Dist. LEXIS 35808, at *8-9 (E.D. Va. Mar. 13, 2017) ("The Fourth Circuit does not recognize individual liability of supervisors for Title VII violations.") (citing Lissau v. S. Food Serv., Inc., 159 F.3d 177, 180 (4th Cir. 1998)); M.S. v. Fairfax Cty. Sch. Bd., 2006 U.S. Dist. LEXIS 53323, at *11-12 (E.D. Va. Mar. 20, 2006) (holding that there is no individual liability under the Rehabilitation Act). Green has not responded to this argument, and for the reasons and authorities correctly cited by the defendants, Reilly, Murphy, and Kocur, in both their individual and official capacities, will be dismissed with prejudice.

### B. **Lack of Subject Matter Jurisdiction**

#### 1. Standard of Review

"Under Fed. R. Civ. P. 12(b)(1), a court must dismiss an action if it finds subject matter jurisdiction lacking." Stewart v. Lee, 243 F. Supp. 3d 722, 728 (E.D. Va. 2017). A Rule 12(b)(1) motion to dismiss must be granted if the complaint "fails to allege facts upon which subject matter jurisdiction can be based." Id. (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). The burden rests with the plaintiff to establish that such jurisdiction exists. Id.

#### 2. Analysis

"Before commencing employment actions in federal court, federal employee complainants must exhaust their administrative remedies." Stewart, 243 F. Supp. 3d at 728 (quoting Pueschel v. United States, 369 F.3d 345, 353 (4th Cir. 2004)). A federal employee is required to exhaust his or her administrative remedies because the administrative complaint determines the scope of the plaintiff's right to file a federal lawsuit. Chacko v. Patuxent Inst., 429 F.3d 505, 508-09 (4th Cir. 2005). Consequently, the plaintiff's allegations in the federal lawsuit must correspond to "those set forth in the administrative charge." Id. at 509; see also Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300-01 (4th Cir. 2009). A plaintiff who has failed to plead a claim or who has abandoned a claim during the administrative process has not exhausted his or her remedies. See Austin v. Winter, 286 F. App'x 31, 35 (4th Cir. 2008).

As the defendants correctly argue, Green did not include allegations of constructive discharge, delayed separation, or failure to provide a reasonable accommodation in his EEO complaint. Ex. L3 [Dkt. No. 1-79] 2-13; Ex. L11 [Dkt. No. 1-87] 7-8; Ex. L14 [Dkt. No. 1-90] 2. Because Green failed to allege these claims in his EEO complaint, he has failed to exhaust his administrative remedies as to these claims, and consequently this Court lacks jurisdiction with

respect to them. Stewart, 243 F. Supp. 3d at 728. Green also raises for the first time in his

opposition to the defendants' motion to dismiss a disparate impact claim. Pl. Opp'n [Dkt. No.

31] 2, 18, 20, 22. Likewise, because Green failed to raise a disparate impact claim in his EEO

complaint, the Court lacks jurisdiction with respect to this claim.[4]

In addition, Green clearly failed to exhaust his administrative remedies for his claim of

retaliation for whistleblower activity when he abandoned that claim during the MSPB

proceedings. Compl. [Dkt. No. 1] ¶¶ 1, 118-25; Ex. P [Dkt. No. 1-95] 8, 27 n.5. Because the

MSPB never issued a final decision on Green's whistleblower reprisal claim, he failed to exhaust

his administrative remedies as to this claim. See, e.g., Harris v. Evans, 66 F. App'x 465, 466 (4th

Cir. 2003) ("Judicial review of a [Whistleblower Protection Act] claim occurs only after the

[MSPB] has issued a final decision on the claim.").[5] Therefore, the Court lacks jurisdiction to

consider Count 6, which will be dismissed.

### C. Failure to State a Claim

#### 1. Standard of Review

Under Fed. R. Civ. P. 12(b)(6), a complaint should be dismissed if it fails to state a claim

upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain

---

[4] A disparate treatment claim focuses on individual treatment a plaintiff receives based on his membership in a protected group. Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190-91 (4th Cir. 2010). A disparate impact claim requires the plaintiff to allege a facially-neutral employment policy or practice that, as implemented, imposes a substantially disproportionate burden on a protected group in contrast with the impact on others outside of that protected group. Abdus-Shahid v. Mayor & City Council of Balt., 674 F. App'x 267, 274 (4th Cir. 2017). Green alleges disparate treatment claims in his Complaint, Compl. [Dkt. No. 1] ¶¶ 1, 3, 72, 75-76, 80, 84, 92, and in his EEO complaint, Ex. L3 [Dkt. No. 1-79] 2-13; Ex. L11 [Dkt. 1-87] 7-8; Ex. L14 [Dkt. No. 1-90] 2. Neither Green's Complaint nor his EEO complaint allege disparate impact claims because, for example, neither document identifies any policy, neutral or otherwise, being challenged as discriminatory or that such policy had a disproportionate effect on specific protected groups.

[5] Green did not oppose the defendants' argument that his whistleblower reprisal claim should be dismissed for failure to exhaust during the MSPB proceeding.

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Ashcroft v. Iqbal, 556 U.S. 662, 678 (U.S. 2009). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Id. (internal citations omitted). When a complaint

pleads facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line

between possibility and plausibility of 'entitlement to relief.'" Id. (brackets omitted) (internal

citations omitted). When evaluating a Rule 12(b)(6) motion to dismiss, a court may consider

exhibits attached to the complaint in addition to the complaint itself. S. Walk at Broadlands

Homeowner's Ass'n v. Openband at Broadlands, LLC, 713 F.3d 175, 181-82 (4th Cir. 2013).

"[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached

[to the complaint]…the exhibit prevails." Id. at 182 (quoting Fayetteville Inv'rs v. Commercial

Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991)).

    "Although a pro se complaint 'must be held to less stringent standards than formal

pleadings drafted by lawyers,' 'even a pro se plaintiff must clear the modest hurdle of stating a

plausible claim showing entitlement to relief.'" Grenadier v. BWW Law Grp., 2015 U.S. Dist.

LEXIS 11418, at *10-11 (E.D. Va. Jan. 30, 2015) (internal citations omitted). "[T]he special

judicial solicitude with which a district court should view…pro se [filings] does not transform

the court into an advocate." Id. (quoting United States v. Wilson, 699 F.3d 789, 797 (4th Cir.

2012) (alterations in original) (internal quotation marks omitted)).

    2.  Gender, Race, and Age Discrimination and Hostile Work Environment
        Claims

    "A plaintiff may establish liability under Title VII by employing two methods of proof:

(1) 'demonstrating through direct or circumstantial evidence that [his status-based group] was a

motivating factor in the employer's adverse employment action'; or (2) relying on the burden

shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." Swaso v. Onslow Cty. Bd. of Educ., 698 F. App'x 745, 747 (4th Cir. 2017).[6] To establish a claim under McDonnell Douglas, "a plaintiff must put forth a prima facie case of discrimination by establishing that: (1) [he] is a member of a protected class; (2) [he] 'suffered an adverse employment action'; (3) [his] job performance was satisfactory; and (4) the adverse employment action occurred 'under circumstances giving rise to an inference of unlawful discrimination.'" Id. (citing Adams v. Tr. of Univ. of N.C.-Wilmington, 640 F.3d 550, 558 (4th Cir. 2011)). "While a plaintiff need not plead a prima facie case to survive a motion to dismiss, a Title VII complaint is still subject to dismissal if it does not meet the ordinary pleadings standard under Twombly and Iqbal." Id. at 747-48.

Green satisfies the first two elements of a prima facie case by alleging that he is a member of multiple protected classes—male, African American, and over the age of 40—and suffered an adverse employment action, dismissal from employment. Although the Complaint alleges over a dozen workplace grievances, most of which focus on either actions by Mike Barylski ("Barylski"), a white male co-worker, or Murphy, Green's direct supervisor who is African American, only his removal from employment qualifies as an adverse action. None of the other grievances, which include—Barylski sitting at his desk, Compl. [Dkt. No. 1] ¶ 87; communicating with his staff without his approval, id. ¶¶ 88-89; speaking condescendingly to him, id. ¶ 89; and Murphy refusing to address his complaints about Barylski, id. ¶ 16; denying certain training requests, id.; reorganizing the IRM department, id.; reducing staff in his department and increasing his workload, id. ¶¶ 16, 23, 86; cancelling one-on-one meetings with

---

[6] Because Green has not alleged any facts supporting direct evidence of discriminatory animus, such as use of a racial epithet or gender or age stereotyping, the McDonnell Douglas method must be applied.

him, id. ¶¶ 22, 45, 48; instructing him to switch offices with one of his co-workers, id. ¶¶ 50-51;

placing him on AWOL status, id. ¶ 16; and placing him on a PIP—qualify as adverse actions.

An "adverse employment action" is one that "adversely affect[s] the terms, conditions, or

benefits of the plaintiff's employment," such that the employee suffers "some significant

detrimental effect" from the action in question. Holland v. Wash. Homes, Inc., 487 F.3d 208, 219

(4th Cir. 2007) (quoting James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir.

2004)); see, e.g., Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999) (including examples of

adverse actions as "discharge, demotion, decrease in pay or benefits, loss of job title or

supervisory responsibility, or reduced opportunities for promotion"). An action which may cause

annoyance or inconvenience, alone, is not sufficient to constitute an adverse action. See Bullard

v. Panasonic Corp., 418 F. Supp. 2d 802, 810 (E.D. Va. 2006). Consequently, courts have found

that non-termination actions, especially where there is no reduction in pay or position, do not

constitute adverse actions regardless of how irritating the actions or how much the plaintiff

disagrees with the way management handled the matters. See, e.g., Mayo v. Smith, 2016 U.S.

Dist. LEXIS 65172, at *20 (E.D. Va. May 16, 2016) ("[N]umerous courts have held that mere

denial of a training opportunity is not a sufficiently adverse employment action to satisfy the

plaintiff's initial prima facie burden."); Cowley v. Lynch, 2015 U.S. Dist. LEXIS 111264, at

*14-21 (E.D. Va. Aug. 21, 2015) (declining to find an "adverse employment action" when the

plaintiff had a change in duties after a reorganization); Bauknight, 2012 U.S. Dist. LEXIS

26475, at *12-15 (holding that the plaintiff did not suffer an adverse employment action when

she was transferred to a different company role); Boone, 178 F.3d at 255-57 (holding that despite

"increased stress," absent "any decrease in compensation, job title, level of responsibility, or

opportunity for promotion, reassignment to a new position commensurate with one's salary level

does not constitute an adverse employment action"). Even though Green's placement on a PIP is more similar to a cognizable adverse employment action than the other grievances, the PIP did not alter the terms or conditions of his employment but instead served as a probationary period for him to improve certain skills to an "acceptable level." See Emmai v. Bolden, 241 F. Supp. 3d 673, 684-85 (E.D. Va. 2017) ("If the PIP did not alter the terms or conditions of employment, it could not be considered an 'adverse employment action.'").

Although Green has satisfactorily pleaded the first two elements, he has failed to plead facts plausibly alleging the remaining two elements. As the government correctly argues, merely claiming that his performance was satisfactory is not sufficient to satisfy the requirement of a prima facie case, particularly given the exhibits he attached showing that his job performance was not satisfactory. Other than pointing to his age, race, and gender, nothing in this extensive record supports a plausible claim that Green was terminated "under circumstances giving rise to an inference of unlawful discrimination." Swaso, 698 F. App'x at 748. Instead, the Complaint and its supporting exhibits contain detailed information establishing that Green and Murphy had a tense relationship, but nothing in those materials link Murphy's behavior towards Green to his race, gender, or age. Although Green repeatedly alleges that Murphy "treated [him] much differently than other equally situated employees in the department," Compl. [Dkt. No. 1] ¶¶ 13, 16, 84, 90, 92, he only identifies Barylski as a comparator. Because Barylaski is in the same gender- and age-protected classes as Green, his claim that gender or age played any part in how he was treated differently is defeated. Moreover, Murphy being in the same race and age[7] groups as Green undercuts his argument that his race and age were a "motivating factor" for any of her actions. See, e.g., Taylor v. CNA Corp., 782 F. Supp. 2d 182, 198 (E.D. Va. 2010) ("[A]n

---

[7] Murphy is approximately two-years older than Green, which means she was in the same protected age group. Ex. N [1-93] 4.

17

allegation of discrimination loses persuasiveness when a key player in the disciplinary process falls within the same protected class as the plaintiff."). Although some of the attached exhibits included affidavits of coworkers which described that African Americans were generally treated differently from white employees, none of those witnesses provided any specific evidence that Green was terminated due to his race. See, e.g., Ex. C4 [Dkt. No. 1-30] 3-4.

Also undercutting Green's allegations that his age, gender, or race were factors in Murphy's decisions to place him on a PIP and to recommend his termination is the evidence in Green's exhibits that those actions were directly taken due to his failure to improve his communication and leadership-related skills. See, e.g., Pl. Addt'l Exs. [Dkt. No. 13] 154-59; Pl. Addt'l Exs. [Dkt. No. 14-1] 9-14. Several of the incidents cited by Murphy in her recommendation to terminate Green for failing to satisfy the PIP are corroborated by his own evidence, which includes multiple examples of Green failing to respond to coworkers' and contractors' requests, failing to provide leadership to his subordinates, displaying a lack of commitment to the job, and not following Murphy's directions. Among those examples are the following:

> Barylski emailed Green on December 29, 2014, asking him to approve an estimate from Mantech, an outside contractor, whose funding was expected to expire by February 10, 2015. Because Green failed to respond, Barylski repeated his request on January 8, 2015. Pl. Addt'l Exs. [Dkt. No. 14-1] 129-30.

> Murphy emailed Green on January 6, 2015 asking him to review and update the contact information for the Justice Management Division by adding Ryan Beauchemin ("Beauchemin") and herself as Management Point of Contacts, among other edits. When Green submitted the updated contact information sheet, he failed to include either Beauchemin or Murphy as Management Point of Contacts. Pl. Addt'l Exs. [Dkt. No. 13-1] 85.

> Greg Collins ("Collins") emailed Green on January 9, 2015 reporting "continued issues with the East mesa f/p server" that caused an inability to print and access files and requesting approval to replace the server. Because Green failed to respond, Collins sent a follow-up email on January 12, 2015 asking if Green had

approved the request and indicating that a judge requested an update. Green did not respond until the next day. Murphy responded to this exchange on January 13, 2018 by telling Green that he "should have provided approval to replace the server a long time ago. Non-responsiveness positions us to provide poor customer service. It's unacceptable." Id. at 91-93.

On January 13, 2015 Murphy received a memorandum concerning the EOIR's deadline for mandatory PIV card use. The next day she forwarded the memorandum to Green and "made clear" that this task was his responsibility. Instead, the next day, Green delegated the task to another employee. Id. at 101. This exchange occurred one month into Green's placement on the PIP and before he filed his informal EEO complaint.

On January 26, 2015, Barylski emailed Green that he had "not heard back from you regarding the Microsoft status meeting. We had another meeting today which you did not attend. This meeting is primarily for operations which is focused on your department. If a different time would be better please let me know." Id. at 59. Green failed to respond.

On February 10, 2015, Joe Cosgriff wrote that a "project kick-off call was held on November 5th with the EOIR team and our team where we discussed the restoration program at a high level. We were provided with the contact information for David Green on the call and instructed to follow up with David regarding next steps. We've reached out to David on a few occasions but did not receive any responses." Green failed to respond. Id. at 72-73.

Because Green has failed to allege a plausible claim that his job performance was acceptable and that his termination occurred under circumstances giving rise to unlawful discrimination, Counts 1 and 2 will be dismissed.

To state a claim for a hostile work environment, a plaintiff must allege that: "1) [he] experienced unwelcome[d] harassment; 2) the harassment was based on [his] gender, race, [] age [,] [or disability]; 3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Jones v. HCA (Hosp. Cor. of Am.), 16 F. Supp. 3d 622, 629 (E.D. Va. 2014) (quoting Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003)). "The Court ultimately should examine whether 'the workplace is permeated with 'discriminatory

intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Sumner v. Mary Wash. Healthcare Physicians, 2016 U.S. Dist. LEXIS 136390, at *25 (E.D. Va. Sept. 30, 2016).

As discussed above, the Complaint contains a laundry-list of Green's workplace grievances. Although several affidavits described the challenging, if not adverse working conditions, including difficulties with contractors and Murphy's management style, fatal to Green's hostile work environment claims is the fact that none of the workplace grievances which he cites, even if deemed harassing, have any connection to his race, age, gender, or alleged disability. Compl. [Dkt. No. 1] ¶¶ 16, 23, 28, 40, 44-45, 48, 50, 86-89. See also Sumner, 2016 U.S. Dist. LEXIS 136390, at *25 ("'[E]ven incidents that would objectively give rise to bruised or wounded feelings,' such as 'rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under [employment discrimination laws].'"). In sum, Title VII only "prohibits an employment atmosphere that is permeated with discriminatory intimidation, ridicule and insult" and "does not establish a general civility code for the American Workplace." EEOC v. Sunbelt Rentals, Inc., 521 F. 3d 306, 315 (4th Cir. 2008) (internal quotation marks omitted). For that reason, Green's hostile work environment claim, Count 5, will be dismissed.

### 3. Disability Discrimination Claim

In Count 4, Green alleges that the defendants have discriminated against him on the basis of his disability, which he describes as high blood pressure, by ignoring his disability, intentionally increasing occupational stress to impact this condition, mocking his condition, and discussing his disability with other employees. Compl. [Dkt. No. 1] ¶ 108. To make out a disability discrimination claim under the Rehabilitation Act, Green must allege sufficient facts

20

demonstrating: (1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) the employer refused to make such accommodations. See Perrin v. Fennel, 2011 U.S. Dist. LEXIS 21730, *15-16 (E.D. Va. Mar. 2, 2011) (citing Rhoads v. Fed. Deposit Ins. Corp., 257 F.3d 373, 387 n.11 (4th Cir. 2011)).

Although the MSPB assumed Green's high blood pressure would constitute a disability within the meaning of the Rehabilitation Act, this Court finds no evidence in this record to support that assumption. A disability for purposes of the Rehabilitation Act is more than just a chronic medical condition. Rather, it is defined as "a physical or mental impairment that substantially limits one or more major life activities." See 29 U.S.C. § 705(9)(B). Although Green alleges that he has "extremely high blood pressure" that can reach to "stroke territory,"[8] he does not allege how his condition substantially limits a major life activity. Compl. [Dkt. No. 1] ¶¶ 3, 17, 110. See also Perrin, 2011 U.S. Dist. LEXIS 21730, at*17 ("Sporadic or otherwise temporary impairments do not qualify as substantial limitations.") (internal citations omitted). Moreover, he fails to allege what accommodation he requested to address his condition, Ex. N [Dkt. No. 93] 3, and the exhibits he submitted contradict his claim of being disabled by his blood pressure or needing any accommodation. Although Green's medical reports dated January 9, February 5, April 10, April 28, and June 18, 2015 show that he took sick leave, each report states that no accommodation was needed and that he could return to work the next day. See, e.g., Ex. F1 [Dkt. No. 1-50] 6, 12, 24, 28, 30. Not only is there no evidence in this record of a disability, there is no allegation of a request for an accommodation or any evidence of a need for an

---

[8] None of the blood pressure readings reflected in Green's exhibits suggest such a dire condition. In fact, two describe his blood pressure as "benign." See Ex. F1 [Dkt. No. 1-50] 7-9, 13-15.

accommodation. Because Green failed to allege sufficient facts to make out a prima facie case of disability-based discrimination, Count 4 will be dismissed.

### 4. Retaliation Claim

To make out a retaliation claim, a plaintiff must allege that (1) he engaged in protected activity; (2) he suffered an adverse action; and (3) the protected activity and adverse actions are causally connected. Valerino v. Holder, 2013 U.S. Dist. LEXIS 136545, at *32 (E.D. Va. Feb. 20, 2013). "[B]ecause causation requires knowledge of the adverse actor, if the relevant actor's knowledge is not apparent from the allegations, Plaintiff must separately allege how and when the actor knew of Plaintiff's EEO activity to survive a motion to dismiss." Id. at *37.

Murphy placed Green on a 90-day PIP on December 15, 2014. Compl. [Dkt. No. 1] ¶ 29. At that time, she did not know, and could not have known, that Green was engaging in EEO activity because his first contacts with the EEO office starting in October 2014 were anonymous. Id. ¶ 126. An "employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary" to allege causation. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). Green filed his informal EEO complaint on January 14, 2015, nearly a month after Murphy placed him on a PIP and Murphy did not learn about the complaint until later in January. Compl. [Dkt. No. 1] ¶¶ 82, 96, 127, 129. Given this chronology, as a matter of law, Green has failed to allege that his placement on the PIP was motivated by his EEO activities. See, e.g., Bauknight, 2012 U.S. Dist. LEXIS 26475, at *15 ("Because the alleged adverse actions took place before plaintiff engaged in protected activity, as a matter of law, those actions could not have been motivated by the filing of the EOC charge.").[9]

---

[9] Green alleges that a few weeks after he filed his EEO complaint, Murphy began a PIP meeting stating "I've learned that you filed an EEO complaint…That is unfortunate…" Compl. [Dkt. No. 1] ¶ 33. Outside of that statement, Green fails to allege any facts showing that Murphy's

Although Murphy's conclusion that Green had not satisfied the PIP and the decision to terminate his employment were made after the decision-makers became aware of Green's protected activity, the Complaint and its attached exhibits demonstrate that Green's termination was directly linked to the PIP as a gradual adverse action. See, e.g., Bart-Williams v. Exxon Mobile Corp., 2017 U.S. Dist. LEXIS 161479, at *56-58 (E.D. Va. Sept. 28, 2017) (holding that placing the plaintiff on a PIP and her subsequent termination constituted a "gradual adverse action," which precluded any inference of retaliation because the initial action started before the plaintiff engaged in protected activity). The PIP informed Green that if he failed to improve his performance to a "satisfactory level," he could be subject to "reassignment, demotion, or removal," and required that he satisfy the PIP's requirements within 90 days. Pl. Addt'l Exs. [Dkt. No. 13] 154-59. Murphy's letter proposing removal stated that Green failed to improve his performance to an "acceptable level," as required in the PIP, and cited several specific examples of unacceptable performances. Pl. Addt'l Exs. [Dkt. No. 14-1] 9-14. As discussed above, several of these examples were corroborated by exhibits Green attached to his Complaint.

Given the clear evidence of unacceptable performance, Green has failed to allege a plausible claim of retaliation because he has not alleged any facts showing a causal connection between his EEO activity, being placed on a PIP, and being removed from employment for failure to meet the PIP's requirements. Bart-Williams, 2017 U.S. Dist. LEXIS 161479, at *56-58.[10]

approach to him was tainted by his protected activity. Murphy extending the deadline for completing the PIP by three-weeks supports the conclusion that her awareness of that protected activity did not prejudice her evaluation of his performance on the PIP.

[10] Even if Green's placement on a PIP and removal were not considered "gradual adverse actions," the Fourth Circuit has held that a three- or four-month lapse between the protected activity and the adverse action is "too long to establish a causal connection by temporal proximity alone." Perry v. Kappos, 489 Fed. App'x 637, 643 (4th Cir. 2012). Murphy did not

For these reasons, Count 3 will be dismissed.[11]

### III. CONCLUSION

In addition to the parties' pleadings, the Court has reviewed the thorough DOJ EEO investigative reports and decision and the MSPB reports and decision which provide a very comprehensive explanation of why Green failed to articulate any evidentiary or legal grounds for relief. Based upon those records, as well as for the reasons stated above, the defendants' Motions to Dismiss for Lack of Jurisdiction and for Failure to State a Claim [Dkt. Nos. 26 and 27] will be granted by an appropriate Order to b e issued with this Memorandum Opinion.

Entered this ⟨1st⟩ day of May, 2018.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

---

propose Green's removal until May 2015 and Kocur approved the removal in July 2015, five to six months after they learned of Green's protected activity. This lapse of time between Green's protected activity and his removal further supports the conclusion that Green has failed to plead a plausible claim of retaliation. Compl. [Dkt. No. 1] ¶¶ 96, 129.
[11] Green also identifies the AWOL charge as an adverse action allegedly taken in retaliation for his EEO activities. Compl. [Dkt. No. 1] ¶¶ 57-59, 95. The Fourth Circuit has concluded in a retaliation action that an AWOL charge did not qualify as an adverse action. See, e.g., Dailey v. Lew, 670 F. App'x 142 (4th Cir. 2016) aff'g 2016 U.S. Dist. LEXIS 51532, at *24-25 (D. Md. Apr. 18, 2016) (holding that an 80-hour AWOL charge was not an adverse employment action).